**AMERICAN SURETY CO. OF NEW YORK et al. v. STATE ex rel. SHULL, Bank Com'r.**

No. 23032.    Opinion Filed April 26, 1932.

Rehearing Denied June 21, 1932.

Tomerlin & Chandler and Troy Shelton, for plaintiffs in error.

R. E. Stephenson, for defendant in error.

RILEY, J. This action was commenced to recover on the bond of C. F. Odell as an officer of the Davenport State Bank, and was brought against C. F. Odell as principal and the American Surety Company of New York as surety.

The cause was tried to the court without a jury. resulting in a judgment in favor of plaintiff against both defendants in the sum of $4,200.64, and defendants appeal.

There is substantially no conflict in the evidence. The bond was for $5,000, and became effective October 6, 1924, and continued in force until September 30, 1928. On the latter date the bond was canceled and a new bond for $5,000 was given, with the United States Fidelity & Guaranty Company as surety. The Davenport State Bank was one of several banks, including the Sapulpa State Bank, controlled by H. A. McCauley. Defendant C. F. Odell was vice president and cashier of the Davenport State Bank, in active charge thereof from October 6, 1924, until September 21, 1929. On the latter date he was removed by the board of directors. By the terms of the bond, Odell, as principal, and the American Surety Company, as surety, bound themselves to pay to the state of Oklahoma such pecuniary loss, not exceeding $5.000, as the Davenport State Bank might sustain by reason of the failure of the principal to faithfully perform all duties required of him while actually employed by said bank,

beginning October 6, 1924, and ending "(a) with date of discovery by said bank that such principal had not faithfully performed all his duties, or (b) with date of retirement of the principal from the service of the bank, or (c) by termination of the suretyship by 30 days' notice in writing as provided in clause 7 of the bond." The bond was terminated by 30 days' notice effective on the date as stated above.

No shortage in the accounts of Odell was discovered until about September 19, 1929, at which time Mr. McCauley sent Mr. H. L. Payne from Sapulpa, with one G. B. Grigsby, to Davenport to examine the condition of the bank. Odell was not in the bank when Payne and Grigsby began their investigation and when they discovered certain irregularities indicating a large shortage in his accounts. On September 21, 1929, the board of directors removed Odell as vice president and cashier. On September 22, 1929, Odell came to the bank, where he, Payne, and Grigsby talked over the affairs of the bank, and the irregularities before mentioned were pointed out to him and he was asked to explain what, if any, other shortage there were. Thereupon Odell went to the records of the bank and produced a ledger sheet of the account of one C. S. Ely, a depositor, and explained that he had marked the account "closed," when there was, in fact, a balance of at least $4,200.64 in said depositor's favor, and that he had taken that amount in cash from the bank and removed the ledger sheet from the files and placed it in the transfer ledger or binder where closed accounts were kept. In this manner the accounts of the bank were kept in apparent balance. But he did not inform Payne and Grigsby, and the records of the bank alone did not show when this occurred. A number of other irregularities were admitted and pointed out by him, but they are not connected with this action and probably occurred after the bond sued on herein had been canceled.

The total shortage amounted to about $20,600. Grigsby at once notified Mr. McCauley, and upon receipt of the report, H. L. Payne, who was assistant cashier of the State Bank of Sapulpa, under direction of H. A. McCauley, wrote to G. B. Grigsby at Davenport, as follows:

"Mr. McCauley ask me to write to you tonight and ask you to get the bond receipt out covering Odell's bond, and write on the back of it 'matured in course of adjustment' and enter this upon the books at $5,000, and take out the receipt for the $2,500 in Liberty Bonds, and lower the cash shortage for the other $2,500.

"He also said to draw a draft on McCauley & Company, for $21,600, and charge that up to the Sapulpa State Bank, and to send for collection, and restore all of the accounts we found. I think this will take care of everything but about $200. He said it would possibly be about a week before all of this large draft would be arranged for and be subject to check."

On September 24, 1929, the Davenport State Bank marked the United States Fidelity & Guaranty bond of $5,000 matured, and entered that amount as assets of the bank, and drew a draft on McCauley & Company for $21,600, and sent it to the Sapulpa State Bank. This draft was never presented to McCauley & Company, but the Davenport State Bank was given credit on the books of the Sapulpa State Bank for the amount thereof, and the draft was carried in the Sapulpa State Bank as a cash item until about November 27, 1929, at which time the Davenport State Bank and the Sapulpa State Bank were both declared insolvent and were taken over by the State Bank Commissioner. In the meantime, $5,400 had been paid to the Sapulpa State Bank on this draft, either by McCauley & Company or H. A. McCauley individually, thus reducing it to $16,200.

No claim was presented to the American Surety Company until about January 30, 1930, at which time the State Bank Commissioner filed a claim with the American Surety Company for the sum of $4,200.64, on account of the alleged embezzlement of the C. S. Ely account by Odell, and in the claim it was stated that the alleged embezzlement of said account occurred before August 11, 1928. On November 22, 1929, G. B. Grigsby, who was then the vice president and cashier of the Davenport State Bank, wrote the American Surety Company as follows:

"The Davenport State Bank has had a defalcation on the part of Chas. F. Odell, cashier and vice president whom your company has bonded by fidelity bond up to September 30, 1928, a part of such default may date back to that time; in the event this is the case we will furnish proof to that effect in a short time."

The draft drawn by the State Bank of Davenport was indorsed by it, and the said draft not having been paid in full, the liquidating agent of the State Bank of Sapulpa asserted the claim against the liquidating agent of the Davenport State Bank for the unpaid balance of $16,200, and thereafter filed an action in the district court of Lincoln county to recover the same, alleging that the Davenport State Bank had received credit for said draft and had drawn checks against said credit which had been paid in the sum of $21,600; that the State Bank of Sapulpa had never received any consideration for the

credit so given except in the sum of $5,-400, and prayed for judgment in the sum of $16,200. By a separate cause of action it sought judgment on the indorsement of the draft by the Davenport State Bank. That action was tried, resulting in a judgment for the defendant, and after a motion for a new trial had been overruled and before time for an appeal had expired, the parties to the action entered into a compromise settlement and agreement which was approved by the district court, whereby the chose in action or claim of the Davenport State Bank, or its liquidating agent, against Odell and the American Surety Company was assigned to the Sapulpa State Bank in liquidation. Thereafter this action was brought on the bond for the benefit of the State Bank of Sapulpa in liquidation, resulting in the judgment appealed from herein.

There are 18 assignments of error, but assignments Nos. 1 to 9, inclusive, are presented under the proposition that no notice was given to the American Surety Company of the loss sued upon within the 45 day period provided in the bond.

The bond sued upon contained the following provisions:

"Provided, however: 1. That loss be discovered during the continuation of this suretyship or within 18 months immediately following the termination thereof, and that notice of such loss be delivered to the surety at its home office in the city of New York, N. Y., within 45 days after such discovery.

"2. That claim, if any, be submitted by the bank, in writing, with the approval of the Bank Commissioner indorsed thereon, showing the items and dates of losses, and be delivered to the surety at its home office within 6 months after discovery. * * * In case any suit, action, or proceeding is begun against the makers of this bond, the state of Oklahoma agrees that the principal shall be made a party to this proceeding, if the action be commenced by the state of Oklahoma or the Bank Commissioner thereof, and that reasonable diligence will be used to bring the principal into court and make him a party to such suit and to have process served upon such principal, as provided by law."

It is conceded that the loss was discovered within 18 months immediately following the termination of the bond, and also that the claim was presented within six months after the discovery of the loss sued for. It was first discovered that Odell was short a large sum of money on or about September 19, 1929, and that the C. S. Ely account had been embezzled by Odell on the 22nd day of September, 1929.

Plaintiffs in error contend that the 45-day period for notice began to run on the latter date, and that more than 45 days intervened between that date and the date it received the letter from Grigsby above quoted. However, it was not known by the officers of the bank on September 22, 1929, that the Ely account had been appropriated by Odell prior to the 30th day of September, 1928. It was not discovered that the appropriation of this particular account was made by Odell, prior to the time the American Surety Company's bond was canceled, nor until about November 22, 1929, on which date the letter was written informing the American Surety Company that it was probable that such defalcation had occurred during the period in which its bond was in effect. It was later definitely ascertained that Odell had "lifted" the C. S. Ely account prior to August 11, 1927.

There is no contention that notice was not given within 45 days after the officers of the bank obtained this definite information. It appears, therefore, that notice was given within the time prescribed by the bond.

All the evidence of admissions made by Odell after September 21, 1929, relative to the C. S. Ely deposit, was objected to by both plaintiffs in error, and separate objections were made by plaintiff in error American Surety Company. The evidence was objected to upon the ground that the admissions were made on September 22, 1929, and that Odell had been removed as an officer of the bank on September 21st, and that, therefore, the admissions, if made, were after the termination of his employment.

It is earnestly contended that the admission of this evidence was error. There can be no doubt of the admissibility of the admissions of Odell as against him, whether made before or after he ceased to be an employee of the bank. Assuming, without deciding. that the evidence of admissions of Odell made after his employment by the bank had ceased was inadmissible as against the surety, the admission thereof does not necessarily require a reversal of the judgment. The evidence, aside from that complained of, as we view the record, conclusively shows that Odell was the person who appropriated the money in the Ely account and who falsified the records of the bank so as to make an apparent balance of the accounts of the bank.

Charlotte Tipton testified that she was employed in the bank as a bookkeeper about July, 1927; that sometime shortly after she went to work in the bank, Mr. C. S. Ely came into the bank and presented his check

for payment in the sum of $200; that thereupon she examined the individual ledger which would reflect the account of C. S. Ely. She identified the ledger sheet and testified positively that, at the time she examined it, it showed the account of C. S. Ely to be closed. She testified, further, that Ely then left the bank and a short time thereafter returned in company with C. F. Odell.

C. S. Ely was called as a witness and testified that he carried an account in the Davenport State Bank commencing about 1920, and continuing up to the time of the failure of the bank; that he seldom checked on this account; that on August 11, 1927, he went to the bank and presented a check for $200; that after he had made some inquiry of Mrs. Tipton concerning his account, he went out of the bank and found Mr. C. F. Odell. His testimony as to what then occurred is:

"Q. When you found Mr. Odell, what statement did you make to Mr. Odell? A. I says, 'I have been up to the bank and they told me my account has been closed.' Q. Your account has been closed? A. My account has been closed. Q. What did Mr. Odell say to you? A. He laughed and said he had a lot of green help up there. He said, 'I wish I had an account like this,' he says, 'closed,' joking, and he patted me on the back. Q. Then did you and he go up to the bank? A. Yes, sir. Q. When you got up to the bank, did Mr. Odell take in his hands any records or examine any records? A. I don't know. Mr. Chandler: We object to that as leading and suggestive. Mr. Stephenson: I don't know what records; I am asking him if he did examine any records. Mr. Chandler: Ask him what he did. A. He went around behind the counter, the railing in front, and pulled out a little drawer and got some papers out of it. I was standing right at the counter. So, he walked across the room, sat down at the table, done a little figuring, then he came back and says, 'Your balance is so and so.' and it was all right; it tallied with my book. Q. Then you wrote out this check, plaintiff's exhibit No. 5? A. Yes, sir. Q. Did you get the cash on that check? A. Yes, sir; he gave it to me. Q. What was the date of it, August 11, 1927? A. Yes, sir."

The $200 check was identified and introduced in evidence, and it shows that it was marked "Paid" August 11, 1927. The individual ledger sheet of his account was identified and introduced in evidence. It shows August 11 (year not shown) the the charge of this $200 check against his account, and a balance in the account August 11 (year not shown) of $4,311.19. On the next line there appears in the "old balance" column $4,311.19, and immediately thereafter the date August 11 (year not given) and after that in the column marked "Checks in detail," the figures $4,311.19, indicating that a check in that amount had been paid, thus leaving the account closed immediately after and apparently on the same date as the payment of the $200 check.

The evidence of Mrs. Tipton and C. S. Ely is uncontradicted. On this record it almost conclusively appears that Odell was the one who falsified the record. He and he alone (aside from C. S. Ely) knew of the payment of the $200 check. He must have known that the ledger sheet showed the account closed when Ely presented the $200 check for payment.

Either at the time the $200 check was paid by Odell, or sometime thereafter, Odell himself balanced Ely's pass book, showing a balance therein to Ely's credit of $4,311.19. At that time the individual ledger sheet in the bank showed the account to be closed. Therefore the books of the bank must have been altered and falsified by Odell, or with his knowledge.

In an unbroken line of decisions from Frick v. Reynolds, 6 Okla. 638, 52 P. 391, to First Natl. Bk. of Ada, 130 Okla. 149, 265 P. 1051, it has been held that:

"This court is not authorized to reverse a cause on the erroneous admission of evidence, unless after an examination of the entire record, it appears to the court that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right."

These decisions were all plainly based upon the provisions of section 2822, C. O. S. 1921, which are:

"No judgment shall be set aside or a new trial granted by any appellate court of this state * * * on the ground of * * * improper admission * * * of evidence, * * * unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

An examination of the entire record does not disclose that the admission of the evidence complained of, if error, resulted in the miscarriage of justice or constituted a substantial violation of a constitutional or statutory right.

It is next contended that the alleged loss of the Davenport State Bank was fully paid and satisfied prior to the commencement of this action. in that the Sapulpa State Bank paid the draft of the Davenport State Bank drawn on McCauley & Company at the direction of H. A. McCauley.

H. A. McCauley, as president of the State Bank of Sapulpa, was without authority to direct the State Bank of Sapulpa to pay the alleged shortage of Odell out of funds and money belonging to the State Bank of Sapulpa. None of the officers of the Sapulpa State Bank could lawfully pay out the funds of that bank for or on account of the defalcation or embezzlement of Odell. H. A. McCauley or McCauley & Company paid only $5,400 on the draft, and the State Bank of Sapulpa had a bona fide claim against the State Bank of Davenport on its indorsement. The settlement and compromise of the controversy between the two liquidating agents was approved by the district court of Lincoln county. There is nothing in the record to show that the credit given the Davenport State Bank by the State Bank of Sapulpa on the draft was given as payment of the claim of the Davenport State Bank against Odell, or that it was intended as such by the State Bank of Sapulpa. On the contrary the record shows that the credit was given by the State Bank of Sapulpa either upon the promise of H. A. McCauley that the draft on McCauley & Company would be paid by that firm or by H. A. McCauley individually, or that it may have been given upon the indorsement of the draft by the Davenport State Bank. Therefore, when the draft was not paid by McCauley & Company or H. A. McCauley, the Sapulpa Bank, through its liquidating agent, was justified in making the claim against the Davenport State Bank and its liquidating agent upon the indorsement of the draft. While it is true that the suit upon this claim went to judgment against the Sapulpa State Bank, from which no appeal was perfected, the claim was adjusted by the assignment of the claim on the bond to the State Bank of Sapulpa, and other consideration. This settlement was approved by the district court of Lincoln county apparently for the purpose of avoiding further delay, which would have been the consequence of an appeal to the Supreme Court.

Had the Davenport State Bank paid the Sapulpa State Bank the $16,200 claimed by it on account of the indorsement, it could not then be said that it had no valid claim on the bond, and there is no merit in the contention of plaintiff in error in this regard.

It is finally contended that there is no evidence to show that the embezzlement of the C. S. Ely deposit occurred between the 6th day of October, 1924, and the 30th day of September, 1928, the period covered by the bond sued upon. We have pointed out that there is ample evidence to justify the finding that such embezzlement occurred prior to August 11, 1927. There is also evidence in the record tending to show that the bank's records showed a balance in the C. S. Ely account of December 15, 1924, of $5,585.37, and that the ledger sheet showing the account appears to be regular down to the later date.

From this evidence, it reasonably appears that the C. S. Ely account was "lifted sometime between that date and August 11, 1927."

The judgment should be, and is hereby, affirmed.

LESTER, C. J., and HEFNER, SWINDALL, and McNEILL, JJ., concur. ANDREWS, J., not participating. CLARK, V. C. J., and CULLISON, J., absent.